UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

MAXINE BARNES,                          )
                                        )
        *Plaintiff*,                    )
                                        )       Case No. 1:09-cv-204
vs.                                     )
                                        )       Judge Mattice
SRI SURGICAL EXPRESS, INC.,             )
                                        )
        *Defendant*.                    )

## MEMORANDUM AND ORDER

Before the Court is Defendant's Motion for Summary Judgment (Doc. 57) ("MSJ")

filed on January 21, 2011, together with a Memorandum in Support (Doc. 58) ("MSJ

Mem."); excerpts from Plaintiff's deposition conducted on October 20, November 10, and

November 30, 2010 (Doc. 57-1) ("Barnes Dep.") and selected exhibits[1] thereto; the affidavit

of Ray Reilly and exhibits thereto (Doc. 57-2) ("Reilly Aff."); affidavit of John DenBleyker

and an exhibit thereto (Doc. 57-3) ("DenBleyker Aff."); and the affidavit of Sharlene

Johnson and exhibits thereto (Doc. 57-4) ("Johnson Aff."). The same day – January 21,

2011 – Defendant ("SRI") also filed a Motion for Partial Summary Judgment as to Punitive

Damages (Doc. 59) ("MPSJ"), also filed together with a Memorandum in Support (Doc. 60)

("MPSJ Mem."); excerpts from Plaintiff's deposition and an exhibit thereto (Doc. 59-1); and

the affidavit of Ray Reilly and exhibits thereto (Doc. 59-2).

On March 1, 2011, Plaintiff responded to both of Defendant's motions in one nine-

page brief (Doc. 64) ("Respon. Br."), together with a (one-page, content-less) "Response

---

[1] Ex. 17, June 6, 2007 Letter from D. Mulkey to M. Barnes re: Written Warning (Doc. 57-1, 122-23) ("June 6 Ltr."); Ex. 18, June 13, 2007 Employee Warning Notice (Doc. 57-1, 124) ("June 13 Warning"); Ex. 19, June 13, 2007 Letter from D. Mulkey to M. Barnes re: Written Warning (Doc. 57-1, 125-26) ("June 13 Ltr."); Ex. 23, Apr. 11, 2007 Mem. from A. Hines to M. Barnes (Doc. 57-1, 127) ("Apr. 11 Mem."); Ex. 24, May 19, 2007 THRC Compl. (Doc. 57-1, 128-135).

to Defendant's Motions for Summary Judgment" (Doc. 63); lengthy excerpts from the transcript of an unidentified deposition (Docs. 63-1 through 63-4); and five unidentified/unlabeled exhibits, including "Exhibit, Evaluations" (Doc. 64-4), "Exhibit, E-mails 1&2" (Docs. 64-1 & 64-2), "Mulkey affidavit" (Doc. 64-3), and "Exhibit, Write-ups" (Doc. 64-5).

On March 8, 2011, Defendant filed its Reply to Plaintiff's Response to its Motion For Partial Summary Judgment – Punitive Damages (Doc. 75) ("MPSJ Reply" or "Partial Summary Judgment Reply"), and then, after a significant discovery dispute,[2] its Reply Brief as to the Motion for Summary Judgment (Doc. 83) ("MSJ Reply" or "Summary Judgment Reply") on April 1, 2011.

On April 6, 2011, Plaintiff filed a Motion for Time to Make Additional Response (Doc. 91) – which the Court construed in its April 13, 2011 Order (Doc. 92) as a Motion for Leave to File a Surreply – and filed a Supplemental Brief in Opposition to Summary Motions (Doc. 94) ("Surreply") on April 15, 2011.

Finally, on April 28, 2011, Defendant filed its "Motion to Strike the Purported Affidavit of Donnie Mulkey, to Preclude Plaintiff from Relying upon the Deposition Testimony of Donnie Mulkey, and for Other Appropriate Sanctions" (Doc. 96) ("Mot. Strike"), together with a memorandum in support (Doc. 98) ("Strike Mem."). Plaintiff filed her response to

---

[2] The so-called "Mulkey affidavit" was generated on February 28, 2011, well after not only the February 15, 2011 close of discovery, but more than a month after Defendant filed its motions for summary judgment on January 21, 2011. This late-created and undisclosed evidence led to a substantial dispute between the parties, resolved by United States Magistrate Judge Carter on March 8, 2011 in his Order (Doc. 74) allowing Defendant to depose Mr. Mulkey and file its summary judgment reply briefs thereafter. Due to delays in getting the transcript, Defendant first filed a copy of its reply brief without citations to or attaching excerpts from the official transcript of the Mulkey deposition (Doc. 82), supplementing it two days later with a copy of the brief with the appropriate citations and excerpts (Doc. 83). Therefore, all references to Defendant's Reply will be to the later-filed reply brief (Doc. 83).

Defendant's motion to strike(Doc. 100) ("Strike Respon.") on May 20, 2011, and Defendant filed its brief in reply (Doc. 101) ("Strike Reply") on May 23, 2011.

For the reasons explained below, Defendant's Motion for Summary Judgment (Doc. 57) and Motion to Strike the Purported Affidavit of Donnie Mulkey, to Preclude Plaintiff from Relying upon the Deposition Testimony of Donnie Mulkey, and for Other Appropriate Sanctions (Doc. 96) will be **GRANTED**, and Defendant's Motion for Partial Summary Judgment as to Punitive Damages (Doc. 59) will be **DENIED AS MOOT**.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment – and the Court to grant summary judgment – "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty*

-3-

*Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)). *See also*, *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id.* at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary

-4-

judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53.

Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

## II.    FACTUAL BACKGROUND

### A.    Problems Raised By Plaintiff's Citations to Evidence in Her Response

As an initial matter, Court would note that, although it views the facts in the light most favorable to Plaintiff, the poor quality of Plaintiff's briefing has considerably complicated the Court's task. Rule 56 is very clear that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by citing to ***particular parts of materials in the record***," and that "[t]he court need consider only the cited materials," although the Court "may consider other materials in the record." Fed. R. Civ. P. 56(c)(1)(A) & (c)(3) (emphasis added).

Further, while this is not a situation where Plaintiff has failed to respond altogether, Plaintiff's Response is so deficient that an evaluation of the Court's responsibilities when presented with an unopposed dispositive motion is appropriate here. A district court cannot grant summary judgment in favor of a movant simply because the adverse party has not

responded; at a minimum, the court is required to examine the motion to ensure that the movant has met his initial burden. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998). But, in the absence of a response, the court will not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). "Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Id.* If such evidence supports a conclusion that there is no genuine issue of material fact, the court will determine that the moving party has carried its burden, and "judgment shall be rendered forthwith." *Id.* (alteration omitted).

The subjects of the instant Order are Defendant's two dispositive motions – one motion for summary judgment and one motion for partial summary judgment on the issue of punitive damages – each of which is accompanied by a memorandum in support totaling twenty-five and seventeen pages respectively. Plaintiff filed a single response to both motions, and the brief in support totaled nine pages. Furthermore, the section purporting to lay out the relevant facts – itself constituting just over two pages of the Response – is lifted almost word-for-word from the Complaint, with Plaintiff omitting Section II(D) (discussing the "EEOC and TCHRC" claims) of the Complaint in the Response and adding two sentences to the end of the second paragraph in Section II(C) (about Plaintiff's confusion and vague feelings about the termination).

Another of the Court's concerns relates to the nature of the materials submitted in

support of her factual allegations. While Plaintiff does attach materials in support of her Response, not only is there no affidavit or declaration authenticating the materials, but the exhibits are never even identified, save Plaintiff's "citations" in her Response, which themselves are never more detailed than "Deposition transcript" (Docs. 63-1 through 63-4) (hereinafter, "Pl.'s Dep."), "Exhibit, Evaluations" (Doc. 64-4), "Exhibit, E-mails 1&2" (Docs. 64-1 & 64-2), "Mulkey affidavit" (Doc. 64-3), and "Exhibit, Write-ups" (Doc. 64-5). (Respon. 2-6.) For instance, Plaintiff relies very heavily on her own deposition, but there is no title page that would actually indicate who was being deposed, and it was only from context that the deponent became clear.

Of more concern to the Court, though, are Plaintiff's actual citations or lack thereof, which result in both paragraphs of wholly-unsupported factual presumptions and incredibly lengthy citations essentially amounting to a data dump on the Court. Of the first eight paragraphs in the "History" section, there is only one cite to any factual support, and that cite supports only the sentence immediately preceding: "Barnes had worked there for about six years and risen to the position of supervisor. Her work was well rated (See Exhibit, Evaluations)." (Respon. 2.) All the other sentences in all those eight paragraphs, constituting the vast majority of her factual background, are unsupported by any citation to the record whatsoever.

But then the very next citation, to the unidentified deposition transcript, is the polar-opposite, containing a string of cites totaling almost 140 (deposition) pages: "(see Deposition transcript, pp12-16; 65-77; 153-166; 188-9; 15-203[3]; 204-11; 215-228; 230-49;

---

[3] The Court presumes, given the deposition excerpts actually attached, that the this page range ("15-203") actually refers to "195-203."

-7-

250-59; 262-3; 265-7; 276-85; 289-305; 306-11; 315-20)." (Respon. 3.) There are three more groups of string cites that bring the total up to almost 200 pages. More frustratingly, the Court reviewed all those page ranges, and it seems as though – even assuming that that long cite was supposed to serve as the citation for *all* of the previous paragraphs – many of them bear little to no relation to any of the sentence(s)(?) for which they are offered in support. *See, e.g.* (Pl.'s Dep. 65-77) (discussing a variety of topics never mentioned in her Response, let alone the preceding sentences, including: her potential interest in becoming a dental technician, certifications she holds – including some incident relating to certifications and paperwork lost by Mr. DenBleyker – even her service in the Army.) Even some of the other exhibits, like "E-mails 1 & 2," total twenty-nine pages, and the Court is supposed to review all those pages to see if they truly support the sentence for which they were offered in support. Here, they were only cited once and for the sentence "[t]heir actions were reflected in the e-mails between Mulkey, Hines and Ray Reilly." (Respon. 6.)

Finally, even when the sentence/citation resembles those usually found in briefs – that is, the string of citations is not nearly as long and the sentence for which it is adduced as support is clear– there are still problems insofar as the citation bears no relationship to that sentence. For instance, in her Response, Plaintiff offers that "[a]ll she knew was that there was something wrong and that it seemed to be racially motivated against her," and cites as support "(See Deposition transcript, pp. 340-3; 325-6; 328-38; 361; 369; 384; 395-6)." Of those page ranges, though, 340-43, 325-26, 328-38 and 369 – more than 80% of the 22 pages cited – contain no reference whatsoever to Plaintiff's race or any relationship it may have had to her termination.

-8-

Accordingly, Plaintiff has failed almost entirely to "support [her factual] assertion[s] by citing to particular parts of materials in the record," as is required by Rule 56(c)(1), both because almost none of her assertions are accompanied by citations to the record and because, when she does cite to the record, the citation is either so lengthy so as not to constitute a citation to "***particular parts*** of materials in the record or bears no relation to the sentence for which it is offered as support. Despite this failure and despite the fact the Court "need consider only the cited materials," this Court still made the effort to review every page cited by Plaintiff and, to the extent possible, the following facts are viewed in the light most favorable to Plaintiff.

## B. Plaintiff's History with SRI from 2001 through 2007

Plaintiff began working for Defendant in October of 2001, likely on October 1, 2001, as that is the date she signed an "Acknowledgment of Receipt" form indicating that she had received and reviewed SRI's Employee handbook. (Pl.'s Dep. 156; Reilly Aff. ¶ 6.) The Employee handbook contained, among other things, SRI's policies on reporting claims of discrimination, its progressive disciplinary process, its safety policies, and instructions on how to contact representatives within SRI's Human Resources Department or, as an alternative, the "Ethics Hotline" SRI had established. (Reilly Aff. ¶¶ 6-17 & Ex. 1, Acknowledgment of Receipt Form signed by Barnes; Ex. 2, excerpts from the Employee Handbook; Ex. 3, SRI's Computer Hardware and Software Policy; & Ex. 4, an exemplar of a posting regarding the Ethics Hotline.)

She was originally hired as an "instrument tech" at SRI, but within a month of her hiring date, she was promoted to an "instrumentation supervisor," although she did not actually have any employees to supervise for some period of time. (Barnes Dep. 153-156.)

When she worked as a tech, her hours were from 7:00 a.m. to 3:00 p.m., but, "as the work picked up," which occurred at some point during 2001, her schedule switched to have her starting at 4:00 a.m. and ending "whenever [she] finished"; her hours changed again in 2007, shifting two hours later to beginning work at 6:00 a.m. to ending at 2:00 p.m. (Barnes Dep. 155-157.)

When Plaintiff applied to SRI, she told John DenBleyker – the Plant Manager at SRI's Chattanooga facility from 1999 until 2007 – that she would be leaving her job with Erlanger to work for SRI. (DenBleyker Aff. ¶ 5.) At Plaintiff's request, he did not contact Erlanger for a reference, but subsequently learned that Plaintiff did not in fact end her employment with Erlanger. (*Id.* at ¶ 6.) Instead of leaving Erlanger, Plaintiff changed from full-time to part-time. (Pl.'s Dep. 446.) She originally worked from 6:00 p.m. to 10:00 p.m. at Erlanger, and then her hours changed from 3:00 p.m. to 9:00 p.m. (Pl.'s Dep. 163.) The change in her schedule at Erlanger, when coupled with the change in her schedule at SRI in 2007, occasionally interfered with her job at Erlanger; for instance, on the days she was asked to work later in the warehouse, she had to call in to her job at Erlanger. (Pl.'s Dep. 192.) On May 29, 2007, Plaintiff requested a change in her work status – from part-time to full-time – at Erlanger; the change was effected in June 2007. (Pl.'s Dep. 168.)

Plaintiff also testified that John DenBleyker is the only individual "that worked at SRI in a management capacity . . . that [she] would trust [and] that [she] had a high opinion of," but Mr. DenBleyker's testimony revealed that while he was Plant Manager, he had a number of issues with Plaintiff's performance that mirrored those at issue in her discrimination claims.(Pl.'s Dep. 194.) For instance, he said that "[w]hile Ms. Barnes exhibited good technical skills with instruments, she did not perform particularly well in

-10-

managing and supervising others, and she sometimes exhibited a poor and negative attitude." (*Id.* at ¶ 9.) Not only did he personally find her sometimes difficult to get along with, but he also received reports from employees, including the former Production Manager Terry Nelson, her immediate supervisor[4], that she was rude, disrespectful, and insubordinate. (*Id.* at ¶¶ 9-10.) While DenBleyker "repeatedly counseled and coached Ms. Barnes regarding her attitude and her interactions with other employees," and "encouraged her to improve her ability to get along with other staff members and employees," which he "noted . . . in the performance evaluations," he reported that she "continued to struggle with her attitude, controlling her temper, and interacting with others in a positive, professional way." (*Id.* at ¶ 11.)

Further, he "periodically discovered that Ms. Barnes was not properly 'gowned out' with personal protective equipment ("PPE") while in the soil sort area"; because she was a supervisor, he found the violation particularly "egregious," and "counseled and corrected" her and "issue[d] her a written warning dated April 27, 2005." (*Id.* at ¶ 12.) In addition, he "experienced problems with Ms. Barnes failing to read and respond to her emails"; he "counseled her about this issue" and "addressed that deficiency in [his] 'note to file' dated April 27, 2005." (*Id.* at ¶ 14; Doc. 57-3, Ex. 1 to DenBleyker Aff., Apr. 27, 2005 Note to File.)

Mr. DenBleyker's observations are substantiated not only by the performance evaluations Plaintiff attached to her Response, but also by the April 27, 2005 note he wrote

---

[4] This conflicts somewhat with Plaintiff's testimony at her deposition that she "reported directly to Mr. Denbleyker" and that he "remained [her] immediate supervisor until Donnie Mulkey was hired." (Pl.'s Dep. 153.)

to her file about her performance issues. (Doc. 64-4, Respon. Ex. "Evaluations"; Apr. 27, 2005 Note to File.) In that note, DenBleyker laid out four main areas of concern:

(1)     ensuring her products were correct;

(2)     "mak[ing] sure that [she was] properly dressed for that area [for the cleaning of the instruments]";

(3)     that, as management, she "will be held responsible for [her] areas and [her] people" and because the mistakes made by employees that worked for her are "a reflection on you and ultimately your responsibility," he "need[ed her] to take on the role of being a manager"; and

(4)     that "[o]ne big complaint from the home office is that you never read your e-mails" – which "is very important" since "[t]hey can tell if it is unopened" – and that "[her] feed back is important.

(Apr. 27, 2005 Note to File.)

Finally, he stated that during the period at issue in her Complaint, she "complained to me that Mr. Hines was insisting that SRI's rules and procedures be strictly followed, [but] she never claimed to me that any rules or procedures were being improperly enforced or implemented," but rather seemed to be complaining that "Mr. Hines was demanding more of the employees of the Chattanooga facility than [DenBleyker] had and was enforcing the rules more strictly than [he] had." (*Id.* at ¶ 16.)

### C.     2007 Overhaul of the Management of the Chattanooga Plant

Ray Reilly, the Vice President of Human Resources & Client Relations, is currently the highest-ranking human resources official at SRI. (Reilly Aff. ¶ 3.) He was hired as the Director of Human Resources on April 23, 2007 – near the beginning of the events in the

Complaint – before being promoted to Senior Director of Human Resources & Organizational Development; at all relevant times he has worked at SRI's corporate offices in Tampa, Florida, although he visited the Chattanooga plant at least once and met with Plaintiff. (*Id. at* ¶ 3.) Reilly said SRI monitored compliance with its policies, including its anti-discrimination policies, through monthly conference calls with Plant Managers and similar calls with the individual Human Resources ("HR") administrators at its facilities. (*Id.* at ¶¶ 18-19.) Reilly also said that the individual plant HR administrators are directed to forward any complaints on to the corporate HR Department, which stays actively involved in all corrective counseling and discipline, and that, during the relevant time periods, he "personally participated in all constructive counseling and disciplinary process involving salaried employees," which Plaintiff was.(Reilly Aff. ¶¶ 21-22.)

In early 2007, SRI decided to change the way the Chattanooga plant was run, including its management; Reilly describes that process as follows:

> In early 2007, as a result of changes in SRI's Chattanooga facility in 2007, SRI decided to change leadership of that facility by replacing its Plant Manager, John Denbleyker, and also by hiring Production and Distribution Managers. The focus and purpose of these changes was to improve the performance of the Chattanooga facility and to ensure that SRI's rules and policies were being properly implemented and, in some cases, followed more closely than had previously been the case. In addition, soon after my joining SRI, I began frequently communicating and working with the leadership at the Chattanooga facility to achieve these goals and objectives.

(Reilly Aff. ¶ 23.)

Effective April 1, 2007, Andrew Hines replaced John DenBleyker[5] as the Chattanooga Plant Manager,[6] and on April 30, 2007, Donnie Mulkey was hired as the new Production Manager and Sharlene Johnson was hired as the new Distribution Manager. (DenBleyker Aff. ¶¶ 3, 15; Reilly Aff. ¶ 24; Johnson Aff. ¶ 3.) Mulkey began corresponding with Reilly regularly on May 23, 2007, including about Plaintiff's behavior, although many of the conversations did not include Andrew Hines. (Reilly Aff. ¶ 24.)

### D. Plaintiff's Performance and May 19, 2007 Charge of Discrimination

Plaintiff alleges that all her problems began with the hiring of Andrew Hines and Donnie Mulkey. (Pl.'s Dep. 207.) Hines, Mulkey, and Johnson likewise appear to have had significant problems with Plaintiff's performance almost immediately upon their respective arrivals at SRI.

For instance, on April 11, 2007, Hines sent Plaintiff a memorandum, which he also discussed with her, in which he said:

> It has come to my attention, via: my observations that you are not putting in the hours required for management According to you, your start time is 4a.m. and today is [*sic*] saw you leave before 11 a.m. Monday and Tuesday you were gone by noon exact time undetermined. I find this practice to be unacceptable and expect it to cease immediately. If you are lacking things to do and need additional assignments, please see me.

---

[5] DenBleyker had served in that capacity since August 17, 1999 and became the Account Manager at the Chattanooga Plant upon Mr. Hines's arrival. (DenBleyker Aff. ¶¶ 3, 15.)

[6] In her deposition, Plaintiff states that she thinks that Hines arrived "maybe a month before Mr. Mulkey and Johnson," and agreed ("[s]omething like that") with counsel's suggestion: "February, March, somewhere in that timeframe?" (Pl.'s Dep. 203.) Because Mr. Reilly's affidavit sets forth dates certain for those arrivals and because those dates correspond with Plaintiff's understanding of the length of time between Hines's arrival and Mulkey's arrival, the Court will use Reilly's dates. This is particularly appropriate given Mr. Reilly's position and access to such information and since Plaintiff acknowledged she was unclear on the precise dates and conceded in her deposition that she had gotten the dates in her first THRC charge wrong.

(Barnes Dep. 367; Doc. 57-1 at page 125, Ex. 23 to Barnes Dep., Apr. 11, 2007 Mem.)

Donnie Mulkey issued his first Employee Warning Notice ("Warning") to Plaintiff for violations of company policies or procedures and safety rules on either Friday, May 4, 2007 or Monday, May 7, 2007. (Doc. 64-5, Respon. Ex. "Evaluations" 4.) He said that on May 3, 2007 at 4:15 a.m., Plaintiff "was in the soil sort room without proper PPE Protection." (*Id.*) On the form, Plaintiff checked the box indicating that she disagreed with his description of the violation and wrote that "[a]ctualizations against me are flase [*sic*] therefore I disagree with the above statement. My warning was on 5/7/07 not on 5/4/07." (*Id.*) She dated her signature 5/8/07, but the routing information (signed by Chattanooga HR Administration Barbara Ridge) is dated 5/7/07. (*Id.*) Mulkey also wrote on the form that she "stated she was at transition area, not in middle of room" and that she refused to sign it, and he initialed these comments and dated them 5-7-07. (*Id.*)

After this warning, on May 19, 2007, she filed a Charge of Discrimination with the Tennessee Human Rights Commission. (Pl.'s Dep. 207; Doc. 57-1, 1st THRC Charge of Discrimination ("1st Charge").) In that Charge, she alleged that she was harassed, intimidated, and retaliated against between March 16, 2007[7] and May 7, 2007, and referred to three incidents in particular: (1) the change in her hours and schedule; (2) the allegation that she was in soil sort without wearing PPE[8]; and (3) the decision to change office

---

[7] Plaintiff conceded in her deposition that she now believed she wrote the wrong date down for the beginning date and clarified that, as the beginning date, she was referring to the meeting between herself and Mr. Hines in which he changed her work hours. (Pl.'s Dep. 374-75.)

[8] She described the second of the three allegedly discriminatory acts – labeled "**Oral warning**" – as referring to an oral warning she received on May 7, 2007 for "not wearing proper protection attire in the transition area in which I work in," i.e. no PPE in the soil sort. (1st Charge ¶ 4(b).) She complains that "[she] was not given a copy of the oral warning and had to ask for it from HR and was initially told that I could not have a copy of it," and justified her refusal to sign it by saying that "because the statement made by the Plant

assignments. (Barnes Dep. 376-77, 395-96.)

As to the first of the allegedly discriminatory acts – captioned "**Change of hours/schedule**" – she argued that Hines "changed the work schedule that I had been working for almost six years but did not change the work schedule of other employees at the same level/job title that I have." (1st Charge ¶ 4(a).) She also argues that Hines's statement that "he observed me leaving early on two days in particular" was "not fact." (*Id.*)

As to the second of the allegedly discriminatory acts – captioned "**Oral warning**" – she stated that she received an oral warning on May 7, 2007 for "not wearing proper protection attire in the transition area in which I work in," i.e. no PPE in the soil sort. (1st Charge ¶ 4(b).) She complains that "[she] was not given a copy of the oral warning and had to ask for it from HR and was initially told that I could not have a copy of it," and justified her refusal to sign it by saying that "because the statement made by the Plant Manager regarding my protective attire is not fact and I did not agree with his statement so I did not sign it." (*Id.*)

As to the third of the allegedly discriminatory acts – captioned "**Office Space/Staff Meeting**" – she argued that she had "been in [her] office space for four years," and that when Hines started, he told her that she "would have to move . . . because he said that he needed additional office space for two additional people they hired." (1st Charge ¶ 4(c).) She alleges that she was told this "verbally" and that this verbal notice was followed up by "a memo . . . to the staff," but that she discovered "at a staff meeting shortly thereafter," that "the memo that I received that was to the staff was only actually given to me and the

---

Manager regarding my protective attire is not fact and I did not agree with his statement so I did not sign it." (1st Charge ¶ 4(b).)

other black supervisor." (*Id.*) She said that there were "two office spaces vacant where he could have put the two new hires," but only she and another black supervisor were told they would have to move, with no Caucasian supervisors being told the same thing. (*Id.*)

Reilly said – and Plaintiff confirmed – that Plaintiff "had never before reported to SRI that she believed she had been discriminated against, and the filing of this Charge was SRI's first notice of any such concern." (Reilly Aff. ¶ 27; Pl.'s Dep. 371.) Reilly personally investigated her claims and, as part of that investigation, visited the Chattanooga plant on June 6, 2007 to meet "in person with Ms. Barnes, Andrew Hines, Mr. Mulkey, Barbara Ridge [Chattanooga HR Administrator], and others regarding Ms. Barnes' allegations and regarding the complaints and concerns about Ms. Barnes' job performance and conduct repeatedly conveyed to me by Mr. Mulkey." (Reilly Aff. ¶¶ 28-29.) Reilly heard numerous complaints about Plaintiff from both supervisors – Andrew Hines, Barbara Ridge, Donnie Mulkey, Dottie Lucas, Quality Assurance Manager, and Lonnie Teague, Maintenance Manager – and employees – Shawanna "Cherry" Sutton and Marcy Jackson. The supervisors all related the same concerns about Plaintiff: "that she was not working enough hours, that she was leaving work before she should, that she was refusing to carry out assigned duties, and that she was exhibiting a negative·and hostile attitude and demeanor . . . confirm[ing] . . . Mulkey's reports in this regard." (*Id.* at ¶ 30.) The employees' complaints related to Plaintiff's "attitude, conduct and demeanor, and her performance as a supervisor," and are substantiated by contemporaneous letters from both employees. (*Id.* at ¶ 31; Collective Ex. 5 to Reilly Aff., June 13, 2007 letter from Cherry Sutton & June 13, 2007 letter from Marcy Jackson.)

Plaintiff does not believe that Reilly was going to talk to her at all, stating that:

-17-

> He came to Chattanooga to talk to the other supervisors. The only reason why he talked to me was an incident took place and I called the main plant and talked to Renee, and she told me that Mr. Reilly was in the plant. And she called and talked to him, and he paged me to the conference room. That's the only reason why I got a chance to talk to him.

(Pl.'s Dep. 198.) Upon further questioning, however, she admitted that this belief was just based upon the fact that he had not called or arranged in advance to meet with her. (*Id.* at 199.)

She talked with him for about thirty minutes, but the focus of the conversation for her was her request to "resign," that is, to step down from her salaried position to an hourly position as a CS tech, which would no longer require her to be a supervisor. (Pl.'s Dep. 195-96; Reilly Aff. ¶ 38.) Reilly said – an account she confirmed in her deposition – that:

> With regard to her desire to change her position of employment, I told her that SRI would consider her request based on its available positions. I told her that she would need to convey her request to me in writing, and I gave her my business card -which conveyed all of my contact information -so that she would know how to reach me and so that she could convey her request for a position change should she decide she wished to do so. Ms. Barnes never conveyed this request to me, and I did not hear anything further from Ms. Barnes on this issue or on any other issue.

(Pl.'s Dep. 196-98; Reilly Aff. ¶ 38.)

### E. Post-Charge Performance Warnings

On June 6, 2007, Mulkey emailed Reilly about Plaintiff's refusal to help in the warehouse, her complaints to other employees about her writeups, her continued early departures, and her general disrespect. (Reilly Aff. ¶ 39.) Reilly helped Mulkey prepare a "Constructive Counseling - Written Warning," which Mulkey delivered to Plaintiff on June

-18-

7, 2007. (Doc. 57-2 at 39-40, Ex. 10 to Reilly Aff., 6/6/07 Written Warning.)[9] A handwritten note below the space for her comments and signature – signed by Donnie Mulkey and dated June 7, 2007 – indicated that she "refused to sign" and "want[ed] a copy for her records." (*Id.*)

On June 11, 2007, Ridge emailed Mulkey to let him know that Plaintiff had been absent four times – 2/19, 4/24, 4/25, and 6/8 – and was "due a verbal for attendance." (Doc. 57-2 at 42, Ex. 12 to Reilly Aff., June 11, 2007 email from B. Ridge to D. Mulkey.) Mulkey issued the Warning on June 12, 2007 (misdated June 13, 2007[10]), and while Plaintiff did not complete the employee statement section, she did sign the acknowledgment that she had read and understood the warning. (*Id.*) That same day, she also received a written warning related to her violations of SRI's computer policies.(Doc. 57-2 at 44-45, Ex. 14 to Reilly Aff., 6/13/07 Written Warning.) As with the June 7 letter, below the space for her comments and signature was a handwritten note signed by Donnie Mulkey and dated June 13, 2007 indicating that she "refused to sign." (*Id.*)

_____

[9] Mulkey's written warning to Plaintiff said that "as a result of recent performance and behavior issues . . . [in]consistent with the expectations of any employee at SRI Surgical." (Doc. 57-2 at 39-40, Ex. 10 to Reilly Aff., 6/6/07 Written Warning.) The letter indicated that "over the past week, [he] ha[d] become aware of the following performance and behavior issues" including "[i]nappropriate conduct as a supervisor," that is, that she was "out in the plant talking with other hourly employees about the constructive counseling, informing them that management does not care about them." (*Id.*) He also said that "[o]n 5/31/07 I communicated to you that it is my expectation that you 'pitch in' and help the team complete the assignments in the facility" – specifically that he "instructed [her] to help out in the warehouse when [she was] done with [her] work – and yet "[n]ot only have you not helped out, you have continued to leave prior to the employees for which you are responsible for have completed their work," which "took place as recently as Monday June 4." (*Id.*) He concluded the letter by noting that "[t]hus far, I have not seen any effort demonstrated on your behalf to function on behalf of the company and meet the performance expectations we have discussed," and that "[i]n the event that we continue to experience issues relating to your performance and/or conduct, further disciplinary action will result up to and including termination of employment." (*Id.*)

[10] On June12, 2007, Mulkey emailed Ridge, asking her to put the warning in Plaintiff's file and discussing the problems in getting Plaintiff to sign the form; the date of the email confirms the accuracy of Plaintiff's date and that the form is misdated.

-19-

On June 22, 2007 and June 25, 2007, Mulkey sent Plaintiff three emails about time-sensitive issues with certain orders; according to Mulkey, Plaintiff did not respond and did not perform the requested tasks. (Reilly Aff. ¶¶ 44-45.) Mulkey, very frustrated by Plaintiff's behavior, contacted Reilly, who helped him prepare another Written Warning related to her failure to respond to emails and perform the requested tasks promptly. (*Id.* at ¶ 47; Doc. 57-2 at 53-54, Ex. 17 to Reilly Aff., 7/2/07 Written Warning.) Even before Mulkey met with Plaintiff, Reilly advised him that "[i]n the event that she requests to have a witness present, we should deny that based upon the negative outcome from the last time we afforded her that opportunity (talking in the plant afterwards with other hourly staff members)." (Doc. 64-1, Respon. Ex. "Emails 1&2" at 13, 7/2/2007 e-mail at 9:50 a.m. from Reilly to Mulkey, cc'ing Hines and Peterson.) Reilly did note that Mulkey "certainly should have another member of the team present, preferably a female if possible." (*Id.*; Reilly Aff. ¶¶ 48-49; Pl.'s Dep. 327-29.) While the circumstances surrounding her refusal to participate in the meeting are contested, it is not contested that on July 2, 2007, Mulkey attempted to issue this written warning to Plaintiff and that she did not want to participate in the counseling without her own witness. (Reilly Aff. ¶ 48; Pl.'s Dep. 327-29.) When informed that was not an option, it came about that she was suspended, but Plaintiff refused to leave without something in writing, which she received. (Reilly Aff. ¶¶ 50-51; Pl.'s Dep. 331-32.)

Reilly was the only individual who could terminate Plaintiff, and he was the one who made the final decision to do so. (Reilly Aff. ¶¶ 54-57.) Reilly stated that:

> In the hours following these events, I communicated by telephone and/or by email with Donnie Mulkey, Andrew Hines, Barbara Ridge, and Sharlene Johnson regarding the attempted counseling session," and that "each separately confirmed to me that Ms. Barnes was grossly insubordinate, defiant, and

> hostile, and that she adamantly refused to participate in the counseling session. Everyone with whom I spoke made clear to me that Ms. Barnes' conduct during this attempted meeting was consistent with her prior conduct and was inappropriate, disrespectful, and insubordinate. Mr. Mulkey again recommended Ms. Barnes' termination, Andrew Hines concurred with that recommendation, and no one voiced any concern or opposition. . . . Based on these reports and this information, and based on my review and analysis of Ms. Barnes' job performance and conduct, I approved Mr. Mulkey's recommendation that Ms. Barnes' employment with SRI be terminated, made the decision to terminate her employment, and authorized and directed her termination.

(Reilly Aff. ¶¶ 53-54.)

Mulkey called Plaintiff and asked her to report back to work that day; for a variety of reasons, she could not, and so she reported back the next day, July 3, 2007. (Pl.'s Dep. 338-40.) At that time, Mulkey terminated Plaintiff for being insubordinate and gave her a copy of the termination notice. (Pl.'s Dep. 340-44.)

Plaintiff at no point contests Mr. Reilly's account of his role in the disciplinary process, merely arguing that Mulkey alone was responsible for harassing her, but that she "blame[s] SRI, too, because they had to know what was going on," and that she is "blaming Mr. Reilly because he knew . . . [a]nd Mr. Hines [because b]y him being the plant manager, he knew what was going on . . . ." (Pl.'s Dep. 13-16.) Plaintiff says that she "only talked with [Reilly] one time" when she asked him about "[s]tep[ping] down from a supervisor to a tech." (Pl.'s Dep. 195.) "Reilly gave [her] his business card while [she was] in Chattanooga with him," but she did not "ever contact Mr. Reilly to say to him that [she was] concerned about writeups [she was] receiving or that [she] thought [she was] the victim of retaliation," nor did she "ever communicate those facts to anyone at SRI before you filed the retaliation charge." (Pl.'s Dep. 416.)

The procedural history of this case and the instant motions has already been recounted in detail above; this matter is now ripe for review.

## III.     ANALYSIS

### A.     Motion to Strike the "Affidavit" of Donnie Mulkey

Well after the instant motions were filed and in his Response to the motions for summary judgment, Plaintiff filed – and relied heavily upon – the so-called "Mulkey Affidavit" (Doc. 64-3). This document carries the caption of this action and the heading "Affidavit of Donnie Mulkey" and contains a series of unnumbered paragraphs containing statements related to Mr. Mulkey's employment with Defendant and his termination of Plaintiff. (*Id.*) It begins with the statement "[a]fter being duly sworn, Donnie Mulkey deposes and says . . ." and ends with "[f]urther the deponent sayeth not." (*Id.* at 1, 3.) The document is entirely typewritten, save the following five handwritten parts on the final page:

(1)     where "left" is written above a stricken-through "was fired";

(2)     following the "further the deponent sayeth not" language, an undated signature appearing to read "Donnie L. Mulkey";

(3)     a handwritten note that closes with the same apparent Mulkey signature stating that "I also swear that my statement to the Human Rights Commission are true and correct";

(4)     "28" in otherwise typewritten "this [*space*] Day of February, 2011"; and

(5)     the signature and stamp of Notary Public Jennifer L. Berz, along with a handwritten note that her commission expires "November 21, 2012."

(*Id.* at 3.)

Defendant states that, at first, it believed Plaintiff's representation that the Mulkey Affidavit was the sworn, notarized statement it purported to be on its face. (MSJ Reply 3; Strike Mem. 2.) Upon seeing that the statements contained therein differed substantially from statements made to it by Mulkey previously, which lead SRI to have a "good faith belief—a belief based, in part, upon the documents exchanged in discovery and upon Mulkey's prior statements regarding the Plaintiff while in the employ of SRI—that most, if not all, of the material statements made by Mulkey in his affidavit either are affirmatively false or are grossly misrepresentative of the actual facts in this case." (Doc. 67, Def.'s Mot. to Extend Deadline for Filing Reply Brief and for Permission to Take the Deposition of Donnie Mulkey, 2.) Defendant, therefore, sought – and received, from Magistrate Judge Carter – an extension of the reply deadline and leave to depose Mulkey. (*Id.*; Doc. 74, Magistrate Judge Carter's March 8, 2011 Order.) Defendant's counsel deposed Mulkey on March 25, 2011 and, as noted above, eventually filed its Summary Judgment Reply Brief (Doc. 83) on April 1, 2011, in which it sought to have the Mulkey Affidavit stricken and asked the Court to consider imposing other sanctions imposed pursuant to Rule 56(h). (MSJ Reply 5.) They requested the same relief – premised upon the same grounds – in their later-filed Motion to Strike the Purported Affidavit of Donnie Mulkey, to Preclude Plaintiff from Relying upon the Deposition Testimony of Donnie Mulkey, and for Other Appropriate Sanctions (Doc. 96), filed on April 28, 2011.

Plaintiff opposed the requested relief in both her Surreply, filed April 15, 2011, and her Response to the Motion to Strike (Doc. 100) ("Strike Repson."), filed May 20, 2011, although she did not make any legal argument or cite any legal authority in support of her arguments. Instead, she largely accused Defendant's counsel of entering into an illegal

agreement with Mulkey either to prevent his testimony or to proure his false testimony; of lying to this Court – despite never seeking review of Magistrate Judge Carter's Order allowing Defendant to take the deposition; and of engaging in witness intimidation – despite never bringing any such objections to the Court's attention, either at the time of the deposition or by specific cite to such objections in the transcript of the deposition. (Surreply 2-3; Strike Respon. 2-4.) She also attached to her Surreply a copy of a few pages from the Mulkey deposition in which Mulkey reiterated the veracity of the statements made in the purported affidavit. (Doc. 94-1, Mulkey Dep. 304-311.)

The Court can discern a general timeline of the events leading to the creation and abortive execution of the Mulkey Affidavit from its own docket, the parties' briefing on this issue, and the limited excerpts of the Mulkey Deposition they attach to that briefing.

As an initial matter, it is important to note that Mr. Mulkey has his own history of litigation with Defendant SRI Surgical Express, Inc. Without going into unnecessarily extensive detail, the end result of the litigation of Mulkey's own claims against SRI was that those claims were dismissed with prejudice due to his failure to prosecute his case two and a half months before the time period relating to the Mulkey Affidavit.[11]

---

[11] On January 4, 2008, more than a year and a half before Plaintiff filed the instant action on August 5, 2009, Mulkey – along with another individual whose name comes up frequently in this lawsuit, Faye Sanders, the other African American supervisor – filed his own lawsuit in this Court against SRI. *See* (*Mulkey v. SRI Surgical Express, Inc.*, 1:08-cv-4, Doc. 1, Compl.) ("*Mulkey* Compl.") In that complaint, Mulkey alleged that Defendant discharged him in retaliation for his complaining about and resisting its racially-motivated attempts to fire Plaintiff and Ms. Sanders in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* (*Mulkey* Compl. ¶¶ 15-30.) Ms. Sanders settled her claims against SRI and stipulated to their dismissal with prejudice on December 30, 2009. (*Mulkey*, 1:08-cv-4, Doc. 35, Stip. of Dismissal with Prejudice.) After several delays and amendments to the scheduling order, Mr. Mulkey's attorney, together with Defendant's attorneys, notified the Court on July 1, 2010 that they had settled the matter, and the Court issued an Order (Doc. 53) on July 14, 2010, putting the parties on notice that it would dismiss the action with prejudice if they did not file a stipulation of dismissal or agreed final order within 30 days. Thereafter, Mulkey repeatedly called the undersigned's chambers saying he did not want to settle the matter; his counsel eventually withdrew his representation and Mulkey repeatedly failed to respond to the orders of the Court,

Around the beginning of February 2011 – Plaintiff's counsel, Charles Dupree, called Mr. Mulkey, and the two spent five to ten minutes discussing Mulkey's version of events and, it seems, a potential affidavit Dupree wanted Mulkey to execute. (Mulkey Dep. 35, 37.) About a month later – "[a]round the first of March . . . [the f]irst of this month sometime" – Mr. Dupree contacted him again and, after "play[ing] phone-tag pretty much all day," Dupree and Mulkey "met in the parking lot of the McDonald's in Ringgold[, Georgia,] for the purpose of [Mulkey] executing an affidavit that Mr. Dupree had prepared." (Mulkey Dep. 37-38.) During that meeting – in which only Mulkey and Dupree participated and which lasted about ten minutes – Dupree presented Mulkey with a draft of the affidavit, asked Mulkey to write on the document that "I swear that the testimony on the — everything in this affidavit is true"; the copy of the affidavit filed with the Court does not contain such language. (Mulkey Dep. 38.)

Next, Dupree called a woman not known to Mulkey, before giving the phone to Mulkey and instructing him to leave a voicemail saying that "[he] was Donnie Mulkey and [he] did sign the affidavit and [he] swear[s] that everything in that affidavit was true." (Mulkey Dep. 38-39.) Dupree's examination of Mulkey during his deposition seemed to indicate that the unidentified woman for whom he left the message was Jennifer Berz, Dupree's daughter and the Notary Public who purported to witness the affidavit's execution. (Mulkey Dep. 306) (Q: And, at the time that you signed it, you also called my daughter, who is a notary, on the telephone and swore to the – was that the telephone call

---

resulting in his action being dismissed with prejudice on November 17, 2010. (*Mulkey*, 1:08-cv-4, Doc. 62, Nov. 17, 2010 Mem. & Order.)

that you were saying that you swore to your signature on the affidavit?" A: Yes. You

actually – but you actually called and handed me the phone.") No one else was present

besides Dupree when Mulkey signed the "affidavit" and, when he signed it, he neither

raised his right hand nor swore in the presence of a person who could administer oaths.

(Mulkey Dep. 39-40.)[12]

Even assuming all facts and inferences in the light most favorable to Plaintiff, the

procedural deficiencies and factual inconsistencies apparent on the face of the "Mulkey

Affidavit," together with the false statements made therein, are so significant as to render

it incompetent evidence and inadmissible, such that the Court must exclude the document

from its consideration of the motions for summary judgment pursuant to Rule 56(c)(4).

Defendant argued – first in its "Supplemented Reply to Plaintiff's Response to Its

Motion Summary Judgment" [*sic*] and then in its Motion to Strike – that the "Affidavit of

Donnie Mulkey" (Doc. 64-3), upon which Plaintiff relied so heavily in her Response to

Defendant's motions for summary judgment and which she attached to that Response, was

wholly unreliable and failed to meet the requirements of an "affidavit," let alone an affidavit

or declaration as discussed in Rule 56(c)(4). Defendant's arguments are compelling, in

large part due to the significant evidence introduced in support and the persuasive citation

of relevant legal authority. As to the first point, the factual evidence, Defendant introduced

proof – in the form of excerpts from the transcript of its March 25, 2011 deposition of

Donnie Mulkey (Doc. 83-1) – that, contrary to the statements made on the affidavit's face:

---

[12] Ms. Berz, in particular, could not have been present, no matter how one looks at it. Given that Mulkey previously indicated that he had left the woman a voicemail, not spoken to her in real time, she cannot claim she "witnessed" it by phone. Further, there is no indication that she had verified his identity in any fashion, and there is significant evidence that Mulkey was *__not__* personally known to her.

(1)     Mulkey was not sworn when he made the statements in question;

(2)     those statements were not "sworn to and subscribed before" the notary, Jennifer Berz," as Mulkey never appeared before Ms. Berz; at best, she was the unidentified woman for whom he left the voicemail message;

(3)     to the extent the "affidavit" embodied "statements . . . subscribed before" Ms. Berz, they were not made in Hamilton County, Tennessee – the only place where Ms. Berz's commission is valid – as Ms. Berz represented they had been, but rather in Ringgold, Georgia – where Dupree met Mulkey for the purpose of having Mulkey sign the "affidavit" Dupree had prepared.

(Doc. 83-1, Mulkey Dep. 37-40.)[13]

---

[13]   In addition to these significant irregularities, there is a discrepancy between the date Ms. Berz represented it was executed – February 28, 2011 – and the date Mr. Mulkey believed he had signed it, March 1, 2011. (Mulkey Dep. 25.)

Although Mulkey seemed fairly certain that he signed the document in March – "around the first of March" and "[f]irst of this month sometime. I can't remember the exact date" – normally, of course, the Court would accept the date provided by the notary and treat the possible one-day discrepancy as a minor conflict. The Court is aware that " there is a legal presumption that a notary public notarizing a deed has acted lawfully" because "[a] notary's acknowledgment says to the world that the execution of the instrument was carried out according to law." *Estate of Wooden v. Hunnicutt*, 2005 WL 2546918,*3 (Tenn. Ct. App. Oct. 11, 2005) (citing *Manis v. Farmers Bank of Sullivan Cnty.*, 98 S.W.2d 313 (Tenn. 1936) and *Beazley v. Turgeon*, 772 S.W.2d 53, 59 (Tenn. Ct. App.1989)). But, as common sense dictates and as was made clear in *Estate of Wooden*, "the presumption that a notary public has performed her duty does not prevail over contrary proof." *Id.* (citing *Manis*, 98 S.W.2d at 314).

The circumstances of this case militate against extending such a presumption of legitimacy to the date the document was signed and raise further questions in the Court's mind about the manner in which this document was executed. For instance, the Court observes that the month and year were already typewritten and Ms. Berz filled in only the date in her own handwriting. Also of interest is the urgency of both Plaintiff – who had not spoken to Mulkey since he had terminated her eight months before, but who called him that day because "she wanted [Mulkey] to – that Mr. Dupree was looking for me to sign some paperwork" – and her counsel in ensuring this document was signed that day, which was the same day it was filed with the Court at 4:29 p.m. on March 1, 2011. (Mulkey Dep. 35, 37, 43.) Given Ms. Berz's (apparent) total failure otherwise to abide by the statutory duties placed upon a notary, the Court notes that there is an obvious possibility that the document was signed on March 1 but Berz simply filled in the date, rather than crossing it out and writing the correct date, to avoid calling the legitimacy of the document into question. Given the other issues with the "affidavit," this line of inquiry is not necessary to the Court's determination of the motion to strike, but it is a matter the Court will discuss with the parties at the hearing.

-27-

Although Defendant's motions to strike and for sanctions were well-supported both factually and legally, Plaintiff makes absolutely no legal argument in response, even just in relation to the affidavit's sufficiency, legality, or legitimacy, instead repeatedly referring to the document as a "sworn statement" given during a "sworn deposition," despite the fact that no oath was ever administered to Mulkey. While, pursuant to 28 U.S.C. § 1746, a formal affidavit is no longer required and a party may substitute an unsworn declaration, such a declaration still must be made "in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)'." 28 U.S.C. § 1746. Therefore, even if this Court were to consider it a declaration, it would still be insufficiently verified, as it was written by Mr. Dupree, not Mr. Mulkey, as it was not dated, and as it did not contain a "under penalty of perjury" certification.

Accordingly, Defendant's Motion to Strike the Purported Affidavit of Donnie Mulkey, to Preclude Plaintiff from Relying upon the Deposition Testimony of Donnie Mulkey, and for Other Appropriate Sanctions (Doc. 96) will be **GRANTED**, and the Court will not consider the Mulkey "Affidavit" (Doc. 64-3) in deciding the pending dispositive motions.

As a final note, the Court observes that the circumstances outlined in Defendant's motions and Mulkey's deposition raise substantial concerns about the candor toward the tribunal of both Attorney Dupree and Notary Public Jennifer Berz.

At a minimum, and leaving aside the concerns about the date the affidavit was executed, Ms. Berz appears to have grossly misstated the case in offering that the affidavit was "[s]worn to and subscribed before me," as no one seems to contend that it was indeed

-28-

signed before her. Although the issue has not been address in depth by courts in Tennessee, there do appear to be some very limited circumstances in which a notary could possibly perform her duties over the phone, such as where the notary is extremely familiar with the voice of the affiant or declarant, such that she has personal knowledge that individual is who he or she states he is; this situation is not one of those limited circumstances, even if affidavits could be notarized by telephone.[14] The Court is concerned not only about candor to the Court in this particular action, but that Ms. Berz may have violated her oath of office that she would "without favor or partiality, honestly, faithfully, and diligently discharge the duties of notary public." Tenn. Code Ann. § 8-16-405. It seems difficult to believe that she reasonably entertained the belief that this method of notarization was acceptable; any of a number of sources clearly outlines the nature of requirements of an affidavit and her duties relating to the same; no oath was administered, she never actually saw or spoke to Mr. Mulkey, let alone verified his identify when notarizing the affidavit, the document was not signed before her, and it was executed in a place where she was not empowered to act.[15]

---

[14] *See, e.g., Estate of Wooden*, 2005 W L 2546918 at *3 (citing *Beazley*, 772 S.W.2d at 60) ("a notary public takes an oath of office when a commission is issued or renewed, and in order to perform as the oath requires, it is necessary for the actor to appear personally before the notary . . . ") *and Montgomery v. Montgomery*, 1989 W L 105645 (Tenn. Ct. App. Sept. 13, 1989) ("The trial judge found that the alteration was made at the direction of the defendant, who then reaffirmed his oath to the agreement in a telephonic statement. Unlike acknowledgments which require personal attendance before a notary, we know of no rule or statute which prohibits the administration of an oath by telephone, although the better practice is confrontation by the notary of the affiant.")

[15] For instance, the Tennessee Notary Public Handbook describes an affidavit as follows:

An affidavit is a sworn statement made by a person called an affiant. The affiant ***makes oath before a notary public*** that the facts contained in the affidavit are true. The affidavit consists of the venue, body, affiant's signature, and jurat. Venue indicates the place where the affidavit is made or taken and ***must be a place where the notary is empowered to act***. The body of the affidavit is preceded by an introductory sentence, contains a short description of the affiant and the capacity in which he or she is taking the oath, and then it

Of equal, if not more significant, concern is Mr. Dupree's apparent lack of candor. In calling the voicemail of his daughter/notary public and directing Mr. Mulkey to leave a message swearing the truthfulness of the statements contained in the affidavit – statements such as that Mr. Mulkey was sworn before "depos[ing]" – that no one disputes are false, he seems to be encouraging, facilitating, and coordinating two separate individuals' making false statements to this Court. Further, he did so as an officer of the Court and in pleadings signed pursuant to Rule 11. The irony of doing so while failing to defend the legitimacy of the affidavit and repeatedly accusing Defendant's counsel of lying to the Court and "gamesmanship" is not lost on the Court.

The Court further observes that this is not the first time Plaintiff's counsel has been less-than-diligent in performing his professional responsibilities and ethical obligations. Within the past five years, Attorney Dupree (Tennessee BPR #002177) has been censured twice by the Tennessee Board of Professional Responsibility, once on July 16, 2007 for failing to ensure that an order reducing his client's child support obligation was properly entered, and again on April 28, 2009 for failing to exercise reasonable diligence in failing to inform the Court and opposing counsel of a scheduling conflict, such that he failed to appear at a hearing "at which contested discovery motions that were critical to his clients' interests were set to be heard." *See* (Releases of Information re: Charles Patrick Dupree,

---

contains the facts the affiant swears are true. The affiant's signature is subscribed at the end of the affidavit and should appear exactly as it appears in the introduction. The jurat, also known as the notary's certificate, is the concluding statement that the affidavit was sworn to before the notary on a certain date. Immediately beneath the jurat appears the signature of the notary before whom the oath is taken, and the notary's commission.

Tenn. Notary Public Handbook (Mar. 2006 ed.) (available at the Tenn. Sec'y of State's website at http://www.tn.gov/sos/bus_svc/notary.htm and last accessed March 26, 2012) (emphasis added).

Reg. No. 2177, dated July 17, 2007 and Apr. 29, 2009 respectively, both available at [www.tbpr.org](www.tbpr.org).)

Therefore, while the motions to strike have already been granted insofar as the evidence has been excluded, the Court will also need to conduct a hearing on this matter to determine whether further sanctions, including, but not limited to, monetary sanctions, are appropriate. The Court will do so in a separate order, but the parties should be prepared to present all evidence relevant to the matter; Defendant's counsel, in particular, shall be prepared to present evidence on all costs associated with the Mulkey Affidavit, including the filing of the motions to strike, the deposition of Mr. Mulkey, and all related costs. Further, the Court will compel the attendance not only of counsel, but of Mr. Mulkey and Ms. Berz.

### B.    Plaintiff's Race-Based Discrimination Claims

Throughout her deposition, Plaintiff repeatedly reaffirmed that the three incidents laid out in her first charge of discrimination – (1) the change in her hours and schedule; (2) the allegation that she was in soil sort without wearing PPE; and (3) the decision to change office assignments – "are the sole incidents that [she] identif[ied] as being evidence of discrimination against [her] based on race." (Barnes Dep. 376-77, 395-96.) After she was terminated, on July 24, 2007, she filed a second charge, alleging that she was fired in retaliation for filing the first charge and in which she described the July 2, 2007 meeting at which she was suspended. (Doc. 22-2, 2nd THRC Charge of Discrimination ("2nd Charge".)

With respect to Plaintiff's Title VII discrimination claims, there is no direct evidence of discriminatory intent, so Plaintiff's claims must be analyzed under the familiar *McDonnell*

*Douglas/Burdine* burden-shifting analysis. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1972). Under this analytical scheme, the burden first falls to the plaintiff to establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53; *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). If the plaintiff is able to meet her burden of showing a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Burdine*, 450 U.S. at 253; *DiCarlo*, 358 F.3d at 414. If the defendant is able to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination, the burden then shifts back to the plaintiff to produce evidence from which a jury could find that the defendant's stated reason is actually a pretext for discrimination. *Burdine*, 450 U.S. at 253; *DiCarlo*, 358 F.3d at 414-15.

Plaintiff has failed to submit evidence from which a reasonable jury could conclude that she established a *prima facie* case of discrimination based on disparate treatment. To demonstrate a prima facie case in this regard, she must show: "that (1) [s]he was a member of a protected class; (2) that [s]he suffered an adverse employment action; (3) that [s]he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than [her]." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007); *see Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). In order to raise a genuine issue of material fact that he was "qualified" for purposes of the Title VII analysis, a plaintiff must "demonstrate that she was meeting her employer's legitimate expectations and was performing to her employer's satisfaction." *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999).

-32-

Defendant is correct that, as to the three circumstances outlined in her first charge of discrimination – (1) the change in her hours and schedule; (2) the allegation that she was in soil sort without wearing PPE; and (3) the decision to change office assignments – Plaintiff has failed to show that these were "adverse employment actions.

To "rise to the level of 'adverse employment actions,'" it must be the "type of action . . . that 'a reasonable employee would have found ... materially adverse, which in this context means [that the action would] dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009) (quoting B*urlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). As the Supreme Court noted in *Burlington*, "it is important to separate significant from trivial harms," and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," *Burlington Northern*, 548 U.S. at 68. As the Sixth Circuit noted in *Hunter*, where a claims are "of a de minimis nature and amount to nothing more than petty slights and minor annoyances . . . no reasonable jury would find these allegedly retaliatory acts so adverse that they would dissuade a reasonable employee from making a charge of discrimination." *Hunter*, 565 F.3d at 996.

None of the circumstances alleged in the first charge rise to that level. For instance, as to the office assignments issue, not only did Plaintiff maintain her main office, merely losing an office where she stored equipment, but it was indeed her idea to do so. (Pl.'s Dep. 393-94.) Further, although the veracity of Defendant's warning about wearing PPE in the soil sort is a contested issue, she has not established that the warning was an

-33-

adverse employment action. As in *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999), there is no evidence here "to show that the lowered performance ratings actually had an effect on her wages"; Plaintiff, therefore, has failed to show that the Court could "conclude that there was a materially adverse employment action." Likewise, as to the change in hours, it is important to note that the hours for the entire instrument department changed, not just her hours. While the Court can see that the change in hours was inconvenient for her insofar as it infringed upon her second job – a job which she told her employer she had quit – the change in hours did not affect her pay or benefits.

Therefore, because Plaintiff has failed to show that the three circumstances identified in her first charge constituted materially-adverse employment actions, she has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, and thus Defendant is entitled to summary judgment as to those claims.

Finally, while Defendant is correct that Plaintiff did not really plead a retaliation claim as to her termination, because almost the entirety of her responsive briefing focuses on purportedly retaliatory actions after the filing of her first charge, the Court will note that such a claim is also unavailing, in large part because she has failed to tie the behavior to the appropriate company representative. As was previously noted, Ray Reilly was the individual responsible for making the decision to terminate her. She never took advantage of the company's procedures for reporting harassment claims, and, even though Reilly himself talked to her for thirty minutes, during that meeting she focused exclusively on reducing her job responsibilities and never raised any issue of discriminatory or retaliatory harassment. Finally, although the Court has already stricken the Mulkey Affidavit, to the

extent one were to consider his allegations about the racially-charged language allegedly used by Hines, Plaintiff does not allege, let alone introduce evidence showing, that Reilly was aware of those statements or shared those sentiments. The record is replete with significant evidence of her poor performance and insubordinate behavior, and Plaintiff offers no evidence that she was treated differently than any similarly situated employee.

Accordingly, Defendant's Motion for Summary Judgment (Doc. 57) will be **GRANTED**, and Defendant's Motion for Partial Summary Judgment as to Punitive Damages (Doc. 59) will be **DENIED AS MOOT**.

## IV. CONCLUSION

Accordingly, and for the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 57) and Motion to Strike the Purported Affidavit of Donnie Mulkey, to Preclude Plaintiff from Relying upon the Deposition Testimony of Donnie Mulkey, and for Other Appropriate Sanctions (Doc. 96) are hereby **GRANTED**. Defendant's Motion for Partial Summary Judgment as to Punitive Damages (Doc. 59) is hereby **DENIED AS MOOT**. As noted above, the Court will set the matter of potential sanctions relating to the "Mulkey Affidavit" for a hearing by separate order.

**SO ORDERED** this 28th day of March, 2012.


_____/s/Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE